**Robert N. Lane**
**Martha Williams**
Special Assistant Attorneys General
State of Montana
Montana Department of Fish, Wildlife and Parks
1420 East Sixth Avenue
P.O. Box 200701
Helena, MT  59620-0701
Telephone: (406) 444-4045
Fax: (406) 444-7456
blane@state.mt.us
mwilliams@state.mt.us

Attorneys for Intervenor Defendant State of Montana

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **DEFENDERS OF WILDLIFE, SIERRA CLUB, AMERICAN LANDS ALLIANCE, ANIMAL PROTECTION INSTITUTE, CENTER FOR BIOLOGICAL DIVERSITY, FOREST WATCH, HELLS CANYON PRESERVATION COUNCIL, HELP OUR WOLVES LIVE ("HOWL"), THE HUMANE SOCIETY OF THE UNITED STATES, KLAMATH FOREST ALLIANCE, KLAMATH-SISKIYOU WILDLANDS CENTER, MINNESOTA WOLF ALLIANCE, OREGON NATURAL RESOURCES COUNCIL, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY ("PEER"), RESTORE: THE NORTH WOODS, SINAPU, AND THE WILDLANDS PROJECT,**<br><br>Plaintiff,<br><br>v.<br><br>**GALE NORTON, SECRETARY OF THE INTERIOR, UNITED STATES DEPARTMENT OF THE INTERIOR AND** | Civil No. 03-1348-BR<br><br>**INTERVENOR-DEFENDANT STATE OF MONTANA'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 1

| | |
|---|---|
| **STEVEN WILLIAMS, DIRECTOR,** | ) |
| **UNITED STATES FISH AND WILDLIFE** | ) |
| **SERVICES,** | ) |
| | ) |
| Defendants | ) |
| | ) |

## I. Introduction

Intervenor Defendant State of Montana submits this memorandum in support of its motion for summary judgment. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Pursuant to Judge Anna Brown's Order of June 24, 2004, the parties filed a Joint Statement of Material Facts on August 10, 2004. In this Joint Statement of Material Facts, the parties agreed that no genuine issues of material fact exist that might preclude summary judgment. In addition, the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), limits the court's review to the administrative record filed with the court May 7, 2004. In light of this provision, the parties further agreed that the administrative record sets forth the relevant material facts. Summary judgment is the appropriate mechanism for determining that the United States Fish and Wildlife Service (FWS) acted reasonably based on the facts in the administrative record and in accordance with the law. Intervenor Defendant State of Montana is entitled to summary judgment because there are no genuine issues of material fact and because it is entitled to judgment as a matter of law for the reasons as stated below.

## II. Standard of Review

The Endangered Species Act (ESA) citizen suit provision allows "any person to commence a civil suit on his own behalf ... to enjoin ... the United States and any other governmental instrumentality or agency ... alleged to be in violation of any provision of

this chapter or regulation issued under" authority thereof. 16 U.S.C. § 1540 (9)(1)(A). Because it does not provide its own scope and standard for review of an agency action, the APA governs judicial review of agency actions made under the ESA. *See*, 5 U.S.C. § 706; *Native Ecosystems Council v. Dombeck*, 304 F. 3d 886, 901 (9th Cir. 2002). Section 706 of the APA sets out a deferential standard of review allowing an agency action to be set aside if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *See also*, *Southwest Ctr. For Biological Diversity v. United States Forest Service*, 307 F. 3d 964, 975 (9th Cir. 2002). Regulations are presumed valid. *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002). Courts have deferred to agency scientific and technical expertise provided that the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made" *Moden v. United States Fish & Wildlife*, 281 F. Supp. 2d 1193, 1201 (D. Oregon 2003) and *National Association of Home Builders v. Defenders of Wildlife*, 340 F.3d 835, 841 (9th Cir. 2003) (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105, 76 L.Ed. 2d 437, 103 S.Ct. 2246 (1983)). Conversely, an agency action is arbitrary and capricious if the agency relies on factors which Congress did not intend it to consider, fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Friends of the Wild Swan, et al, v. United States Fish & Wildlife*, 12 F. Supp. 2d 1121, 1131 (D. Oregon 1997). In summary, a reviewing court will consider whether the agency acted within the scope of its authority, based its decision on the facts in the record, adequately explained its decision, and considered the relevant factors.

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 3

*Moden*, 281 F. Supp. at 1201.  This probing, in-depth review is based on the administrative record which must form the basis of the agency's decision.  *National Association of Home Builders v. Defenders of Wildlife*, 340 F.3d 835, 841 (9th Cir. 2003).

**III.  In Adopting the Final Rule that Established Three Discrete and Significant Distinct Population Segments for the Gray Wolf, the FWS Complied With the ESA and its Distinct Population Segment Policy.**

The Plaintiffs appear to challenge the FWS application of the Distinct Population Segment (DPS) policy, not the policy itself.  Therefore the issue is whether the FWS considered the relevant factors established by the ESA and the DPS policy, based its decision on facts in the record, and adequately explained its decision.

Congress passed the ESA to provide a way in which the FWS could take steps to conserve endangered and threatened species and the ecosystems upon which endangered and threatened species depend.  16 U.S.C. § 1531 (b).  To meet this goal, the ESA provides for the conservation of the endangered and threatened species until they no longer meet the definitions of endangered and threatened.  16 U.S.C. § 1533.  The ESA defines species to "include any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532 (16).  Therefore, the ESA allows the FWS to designate a species as a DPS and then consider that DPS as a species for listing, delisting, or a change of classification.  *See*, JSMF ¶ 104.  The ability to designate and list DPSs allows the FWS to provide different levels of protection to different populations of the same species.  JSMF ¶ 110; s*ee also,* DPS Policy, 61 Fed. Reg. 4722, at 4725 (Feb. 7, 1996).

Because the ESA does not define DPS, the FWS and National Marine Fisheries Service adopted the DPS Policy to clarify their interpretation of distinct population

segments for purposes of listing, reclassifying, and delisting vertebrate species. JSMF ¶ 103; 61 Fed. Reg. AT 4722. This policy sets out elements the FWS must consider when determining the status of a possible DPS for listing, reclassification, or delisting, thus allowing the FWS to use the tool of a DPS for the conservation of a species. *See* JSMF ¶ 106; 61 Fed. Reg. at 4725. However, the DPS policy does not mandate the FWS to designate a DPS when those elements have been met. *See*, *Id*. at 4725. The FWS considers the "1. [d]iscreteness of the population segment in relation to the remainder of species to which it belongs; 2. The significance of the population segment to the species to which it belongs; and 3. The population segment's conservation status in relation to the Act's standards for listing…." JSMF ¶ 106; 61 Fed. Reg. at 4725.

To be discrete, a group of vertebrate animals must be markedly (but not completely) separated from other populations of the same taxon by physical, physiological, ecological, or behavioral factors; or be delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section (4)(a)(1)(D) of the ESA. JSMF ¶ 107; 61 Fed. Reg. at 4725. In its DPS Policy, the FWS stated that it established the standard for discreteness to adequately define and describe an entity given DPS status. 61 Fed. Reg. at 4724. "In determining whether the test for discreteness has been met under the policy, the Services allow but do not require genetic evidence to be used." 61 Fed. Reg. at 4723.

If a population is discrete, the FWS then considers the "biological and ecological significance of the population to the taxon to which it belongs." JSMF ¶ 108; *Id.* at 4724-25; *National Homebuilders*, 340 F.3d at 844. The purpose of the significance element is

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 5

to carry out the expressed congressional intent that the authority to list DPSs be exercised sparingly while encouraging the conservation of genetic diversity. *Id*. at. 4725; *National Homebuilders*, 340 F.3d at 844. Evidence of significance includes the use of an unusual or unique ecological setting, a marked difference in genetic characteristics, or the occupancy of an area, that if devoid of species, would result in a significant gap in the range of the taxon. JSMF ¶ 108; 61 Fed. Reg. at 4725. The FWS has interpreted a gap to include not only a break in range but also the loss of the outermost limit of a range. *See, National Homebuilders*, 340 F.3d at 846. "As with a species or subspecies, a DPS recovery program is not required to seek restoration of the animal throughout the entire geographic area of the listed entity, but only to the point at which it no longer meets the definition of a threatened or endangered species." JSMF ¶ 199; 68 Fed. Reg. at 15807-08. If the DPS meets both the discreteness and significance factors, the FWS then reviews the DPS's status in relation to the ESA's definition of threatened and endangered and in relation to the factors for listing, reclassification, and downlisting in section (4)(a)(1) of the ESA. JSMF ¶ 110.

In its final rule, the FWS explained its decision to establish three DPSs, explained how it considered the relevant factors of DPS policy, and in making its determination articulated a rational connection between the facts before the agency and the choices the agency made. *See*, JSMF ¶ 184. For example, in the Final Rule, the FWS gave a factual background, summarized the issues relevant to its determination, and explained for each of the DPSs, the Eastern, the Western, and the Southwestern, how in making its determination it considered the three elements of the DPS, discreteness and its two sub

elements, significance and its four sub elements, and the conservation status and its five sub elements.

For the Eastern, Western, and Southwestern DPSs, the FWS explained on what facts it relied to determine that each DPS is discrete. The FWS opined that the gray wolf populations in each DPS are separated "by large areas that are not occupied by breeding populations of resident wild gray wolves." JSMF ¶ 183; 68 Fed. Reg. at 15819. Further, the FWS stated that it believed "that the existing geographic isolation of wolf populations in each of these three DPSs from the other far exceeds the Vertebrate Population Policy's criterion for discreteness of each DPS." 68 Fed. Reg. at 15819. The FWS explained it uses of the United States-Canada border to mark the northern portions of the boundaries of the Western and Eastern DPSs because wolf populations in Canada are generally more numerous and wide-ranging and Canadian law does not protect wolves to the extent that our federal regulations do. *Id*. The Southwestern DPS does not stop at the Mexican border because of the cooperative gray wolf conservation efforts between the United States and Mexico. *Id.*

Using the four elements of significance from the DPS policy and the examples it provided, the FWS further set out its reasons why it determined that all three DPSs of the gray wolf satisfy the significance criteria and were similar to examples 2 and 4 from the DPS policy. See JSMF ¶ 185; 68 Fed. Reg. at 15819. The FWS determined each DPS to be significant in part because the loss of any of the three discrete population segments of the gray wolf would result in a significant gap in the range of the taxon. "Loss of the discrete wolf populations in either the Eastern DPS, the Western DPS, or the Southwestern DPS would clearly produce huge gaps in current gray wolf distribution in

the 48 states." JSMF ¶ 183; see also JSMF ¶ 153; 68 Fed. Reg. at 15819.  Moreover, the FWS found "that there are strong indications that the three populations of wolves are separate reservoirs of diversity that differ from each other and are thus significant to the species."  JSMF ¶ 185.  While there is continuing study and controversy over subspecific taxonomy of the gray wolf, several studies agree that the three DPSs are recovering different evolutionary lineages of the gray wolf.  JSMF ¶ 185.

As part of its review of the DPS status in relation to the ESA's listing factors, the FWS evaluated "what is necessary for long-term extinction avoidance in each DPS, and the extent of progress made to date toward that goal in each DPS." 68 Fed. Reg. at 15809.  In applying the listing factors to the DPSs, the FWS applied the principles of conservation biology and focused on the size, number, makeup, and distribution of wolves in the individual DPSs, and the threats manifest there for each DPS evaluation.  JSMF ¶ 35; JSMF ¶ 188.  68 Fed. Reg. at 15809.  The FWS opined that three DPSs as delineated in the final rule preserve all of what remain of the gray wolves' genetic diversity in the lower 48 states and Mexico.  *See*, 68 Fed. Reg. 15824 (Apr. 1, 2003).  For the Eastern DPS, the FWS found that the "second wolf population in Wisconsin and the Upper Peninsula of Michigan located less that 200 miles from the Minnesota gray wolf population ensured the genetic diversity necessary for representation."  JSMF ¶ 202.  For the Western DPS, after an analysis of the conservation biology principles of representation, resiliency, and redundancy, the FWS found that wolves in this DPS should be downlisted based on their success in meeting the revised recovery criteria and based on the assessment of the remaining threats facing gray wolves in the Western DPS. JSMF ¶ 207.  Further, the FWS found that the viable and self-sustaining populations of

gray wolves coupled with distances between the populations that will provide a great deal of protection from multi-population catastrophic events will allow the gray wolf to respond to any adverse factors that may arise. 68 Fed. Reg. at 15824.

In support of its consideration of the relevant factors to a DPS determination, the FWS requested the "expert opinions of independent specialists [on] the pertinent scientific or commercial data and assumptions relating to supportive biological and ecological information in the proposed rule." 68 Fed. Reg. at 15819. The FWS received comments from eleven independent experts who reviewed the proposed rule and supporting data for any mistakes in data or analysis or to identify relevant data that the FWS had overlooked. 68 Fed. Reg. at 15820. While all supported the DPS approach, they did not all support the DPSs as delineated. 68 Fed. Reg. at 15820; JSMF ¶ 176. In summary, the FWS acted within the scope of its authority, considered the relevant factors, based its decisions on the facts in the record, and adequately explained its decision.

**IV. In Its Determination to Reclassify Gray Wolves in the Western and Eastern DPS from Endangered Status to Threatened Status, the FWS Explained How, Based on the Administrative Record, It Considered the Criteria of 4(a)(1).**

A purpose of the ESA is to provide a means by which endangered and threatened species, and the ecosystems upon which they depend, may be conserved and to take steps to achieve this purpose. 15 U.S.C. § 1531(b). The primary mechanism for carrying out the purpose of the ESA is the federal agency's determination of "whether any species is an endangered species or a threatened species because of the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 9

>    (C)  disease or predation;
>    (D)  the inadequacy of existing regulatory mechanisms; or
>    (E)  other natural or manmade factors affecting its continued existence."

16 U.S.C. § 1533(a)(1)(A-E).

Federal agencies use this criteria to list a species that meets the definition of threatened or endangered, reclassify a species that no longer meets one of these definitions but meets the other, or delist a species that no longer meets these definitions.  The ESA defines endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range…." 16 U.S.C. § 1532(6).  The ESA defines a threatened species as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532 (20).  The ESA directs federal agencies such as FWS to implement conservation measures to improve a species status to the point at which it no longer needs protection.  The FWS may do this in part through conservation measures and procedures.  16 U.S.C. § 1532(3); 50 C.F.R. § 424.11.  The ESA's implementing regulations define recovery as "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02.  While the ultimate goal of the ESA is to improve a species' status to the point at which it no longer needs protection, the ESA also recognizes a species may first need to go through the intermediate step of reclassification.  The FWS determined the gray wolf to be such a species.  JSMF ¶ 1.

To reclassify a species from endangered to threatened status, the FWS must consider the goals for reclassification set out in the recovery plans and it must consider the factors for listing from (4)(a)(1) of the ESA. The FWS's decision to reclassify a DPS

must be made "solely on the basis of the best available scientific and commercial information regarding a species' status." JSMF ¶ 105; 50 CFR § 424.11(b). Moreover, the ESA's implementing regulations mandate that a species be reclassified to threatened status if the Secretary of Interior determines that on the basis of the best scientific and commercial information available, a review of the species' status shows that the five listing factors support that the species' status is no longer in danger of extinction but is likely to become endangered. In this instance, the FWS needs to show that the gray wolf has met its recovery plans' reclassification goals and that the facts in the administrative record support the FWS's determination that the gray wolf is not in danger of extinction.

**A. Recovery**

The ESA requires the FWS to identify, list, and protect species, subspecies, and distinct population segments that are endangered or threatened and maintain that listing until the species has recovered. 16 U.S.C. § 1533(a)(1). The ESA directs the Secretary of the Interior to develop and implement recovery plans for species listed as threatened or endangered. 16 U.S.C. § 1533 (f). Each plan must to the maximum extent practicable incorporate a description of site specific management actions, the plan's goal for the conservation and survival of the species, and objective measurable criteria that when met would result in the species removal from the list. JSMF ¶ 35. To determine whether or not a species is recovered, the FWS must evaluate the current status of the species in light of the recovery goals established for the species in the recovery plan. Other than requiring that recovery plan goals be met, the ESA does not speak to the geographic extent that recovery is required. The definitions of threatened and endangered measure the species status throughout "all or a significant portion of the species range." The

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 11

geographic area covered by Eastern and Western and Southwestern DPSs include a significant portion of the gray wolf's range because they encompass an "area that is important and necessary for maintaining representative population or populations, in order for the taxon [gray wolves] to persist into the foreseeable future." *See*, JSMF ¶ 190.

The FWS determines recovery in part on representation, resiliency, and redundancy, three principles of conservation biology necessary for the biodiversity of an area. JSMF ¶ 36. Representation is the need to preserve some of everything, redundancy is the need for a sufficient number of populations of a species, and resiliency is the need for a certain numerical and geographic size of the individual populations needed for the species to persist over time. JSMF ¶ 37, 38 and 39; 68 Fed. Reg. 15809 (Apr. 1, 2003).

When the FWS considers these relevant factors that the ESA and its implementing regulations establish, it must articulate a rational connection between the facts found and the choices made. *National Association of Home Builders v. Defenders of Wildlife*, 340 F.3d 835, 841 (9th Cir. 2003). The Eastern Timber Wolf Recovery Team found the Minnesota wolf population to be vital to the remaining genetic diversity of gray wolves in the eastern United States and therefore insisted that for recovery or reclassification, the remnant Minnesota population must be maintained and expanded. 68 Fed. Reg. at 15810. "The Minnesota wolf population currently is estimated to be double that numerical goal." 68 Fed. Reg. at 15810. "To achieve gray wolf recovery in the eastern United States, the 1992 Revised Eastern Timber Wolf Recovery Plan describes two delisting criteria" of at least two viable populations within the lower 48 states that meet these conditions "(1) the Minnesota population must be stable or growing, and its continued survival be assured

and, (2) a second population outside of Minnesota and Isle Royale must be re-established, having at least 100 wolves in late winter if located within 100 miles of Minnesota wolf population, or having at least 200 wolves if located beyond that distance." JSMF ¶ 46. Further, the 1992 Eastern Timber Wolf Recovery Plan recommends that wolves in Wisconsin and Michigan be reclassified from endangered to threatened status if the population within each of these states remains at or above 80 wolves for 3 consecutive years. JSMF ¶ 49; AR Doc. 1198 at 22066. By 1998, the Eastern Timber Wolf Recovery Team recommended that the FWS reclassify Wisconsin and Michigan wolves because they had met their reclassification goal of 80 individuals in each state for three years. JSMF ¶ 79. By 1999, gray wolves in Minnesota, Wisconsin, and Michigan exceeded the numerical delisting criteria established in the Eastern Plan. JSMF ¶ 80.

The 1987 Northern Rocky Mountain Wolf Recovery Plan set out the original recovery goals for northern rocky wolves as a minimum of ten breeding pairs in each of the three recovery areas for a minimum of three successive years. JSMF ¶ 59. For reclassification to threatened status, the plan set out the goal of ten breeding pairs in each of two recovery areas for a minimum of three successive years. JSMF ¶ 60; AR Doc. 1197 at 21949. The three recovery areas are the northwest Montana recovery area, the central Idaho recovery area, and the Yellowstone recovery area. JSMF ¶ 59; AR Doc. 1197 at 21932, 21949. The gray wolf population in these three recovery areas are no longer isolated from each other and wolves now move from one recovery area to another as evidenced by dispersals and interbreeding, creating one large metapopulation. JSMF ¶ 18; 68 Fed. Reg. at 15810. In 2002, the FWS revised the criteria for reclassification to threatened status for the Northern Rocky wolf, setting out the goal of 20 packs or 200 or

more wolves across the metapopulation for three years. JSMF ¶ 60. "There have been at least 300 wolves in a minimum of 30 packs since the end of 2000, and at the end of 2001 there were 563 wolves in 34 packs within the metapopulation." JSMF ¶ 93; 68 Fed. Reg. at 15810, 15828. "In 2000, the Central Idaho population of wolves met the 1987 recovery plan goal of ten breeding pairs for more than three consecutive years." JSMF ¶ 94. "In 2002, the Greater Yellowstone Area reached the 1987 recovery plan goal of ten breeding pairs for more than three consecutive years." JSMF ¶ 95.

**B. Threats**.

In addition to requiring that a species, subspecies, or distinct population segment meet its goals for recovery or reclassification set out in a recovery plan for reclassification of a species, the ESA also requires the FWS to consider the five listing factors set out in 4(a)(1) of the ESA to determine the status of the species. 16 U.S.C. § 1533(a)(1) and (f). The FWS must base its status review on the best scientific and commercial information available when considering these 5 criteria: 1) loss or degradation of habitat or range; 2) over-utilization for commercial, scientific, or other purposes; 3) disease or predation; 4) inadequacy of regulatory mechanisms; and 5) any other natural or manmade factors. 50 C.F.R. § 424.11. If any one of the five factors present a threat to the species, subspecies, or DPS of becoming extinct rather than endangered, it may still be reclassified. However, to delist it, is necessary to show none of the five threats are present or foreseeable. Because this is a reclassification action, the FWS reviews whether the species is likely to become endangered rather than whether the species is likely to be in danger of extinction. Because the FWS did not feel that the gray wolf in any of the three DPSs could meet the recovery goals, the FWS proposed downlisting

from endangered to threatened. 68 Fed. Reg. at 15827. However "[g]iven the continued recovery progress of gray wolves in the West and western Great Lakes States, and State wolf management plan development work that has happened subsequent to" the reclassification rule, the FWS argues the best commercial and scientific information shows recovery in many areas has now been met. *Id.* This progress shows that the status of the gray wolf in the Eastern and Western DPSs is most appropriately determined as threatened.

In the Final Rule, the FWS analyzed the present or threatened destruction, modification, or curtailment of the gray wolf's habitat or range. JSMF ¶ 260. The FWS stated that wolf research, data, and experience have shown wolves are highly adaptable, are able to occupy a wide range of habitats, and are not dependant on wilderness or parks for survival. JSMF ¶ 263; JSMF ¶ 8. The important components of wolf habitat are sufficient prey and adequate protection from human-caused mortality. *See*, 68 Fed. Reg. at 15841; JSMF ¶ 263. Specifically, wolves in the western Great Lakes span a broad range of habitats from the "mixed hardwood-coniferous forest wilderness area of northern Minnesota; through sparsely settled, but similar habitats of Michigan's Upper Peninsula and northern Wisconsin, into more intensely cultivated and livestock-producing portions of central and northwestern Minnesota and central Wisconsin; and even approaching the fringes of the St. Paul, Minnesota, and Madison, Wisconsin, suburbs." 68 Fed. Reg. at 15842. Further, the FWS explained that based on computer modeling for the Eastern DPS, Wisconsin and the Upper Peninsula of Michigan contain large tracts of wolf habitat, estimated at 5,812 square miles and 11,331 square miles respectively. Much of this habitat in Wisconsin is on public lands. The FWS concluded

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT PAGE 15

that habitat or range destruction or degradation, or related factors that may affect gray wolf numbers, do not by themselves or in combination with other factors place the Eastern DPS of the gray wolf in danger of extinction. *See*, JSMF ¶ 267; 68 Fed. Reg. at 15845. "Based on the recommendation of a large group of professional peer reviewers (biologists, academics, and wolf managers), the FWS determined that for wolves, "population viability is a function of the population and not the area it occupies." JSMF ¶ 194. Additionally, state, tribal, and federal recovery efforts over the past decade provide protection for wolf populations, maintain their prey base, preserve denning sites and dispersal corridors and are likely to keep wolf populations well above the numerical recovery criteria. JSMF ¶ 268.

Similarly, in its Final Rule, the FWS found that for the Western DPS, destruction, modification, or curtailment of the gray wolf's habitat is not a present or foreseeable threat that would put the DPS in danger of extinction, by explaining that "potential wolf habitat are secure, and no forseeable habitat-related threats prevent them from supporting a wolf population that exceeds recovery levels." *See*, JSMF ¶ 269. Additionally, Idaho and Montana have maintained ungulate populations sufficient to support a recovered wolf population. JSMF ¶ 310.

Next, the FWS considered whether the threat from overutilization for commercial, recreational, scientific, or educational purposes would put gray wolves in danger of extinction across a significant portion of its range. "Since their listing under the ESA, no gray wolves have been legally killed or removed from the wild in the conterminous 48 United States for either commercial or recreational purposes and the FWS believes no wolves have been removed from the wild for educational purposes in recent years."

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 16

JSMF ¶ 272.  Regarding killing of wolves, changing the status of gray wolves from endangered to threatened would not significantly alter the protection afforded them under the ESA.  The taking of gray wolves would still be prohibited, unless authorized by federal permit.  The FWS concluded that although pursuant to an approved conservation agreement, state or conservation agency employees would be able to kill a wolf for conservation purposes, the best scientific and commercial information available indicates that the number of wolf mortalities from conservation purposes will not inhabit or significantly impede gray wolf recovery in the three DPSs.  JSMF ¶ 273.  Moreover, "[t]he 4(d) Special Regulations for the Western DPS do not permit any legal take for commercial, recreational, or educational purposes." JSMF ¶ 312;  68 Fed. Reg. at 15846.

In making its reclassification determination, the FWS considered how disease or predation may threaten the gray wolf.  The FWS recognized that disease has potentially significant impacts on wolf populations and recommended continual monitoring for evidence of disease.  JSMF ¶ 277 and 280.  For example, Canine parvovirus has been present in and impacted the western great lakes population but the population has continued to recover in spite of this.  JSMF ¶ 285.  In its consideration of disease in the Eastern DPS, the FWS concluded that the overall trend upward in wolf numbers in the western Great Lakes and the disease and health monitoring conducted by the three state Departments of Natural Resources and the Madison Wildlife Health Lab will result in the continuation of wolf recovery in these states.  JSMF ¶ 285. Gray wolves in the Western DPS have been exposed to a variety of diseases, but "in the studies of wolves in Montana, Idaho, and Wyoming to date, disease and parasites have not appeared to be a significant factor affecting wolf population dynamics."  JSMF ¶ 286; 68 Fed. Reg. at 15848.

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 17

Although disease is a factor that can affect wolf populations, it is present in both the western Great Lakes wolf populations and the Northern Rocky Mountain populations and yet these populations have continued to rebound and recover. *See*, JSMF ¶ 285 and 291.

Predation also plays a role in wild gray wolf populations. While no wild animals habitually prey on gray wolves, humans are the most significant predators of gray wolves. JSMF ¶ 292 and 299. The taking of wolves for a purpose other than conservation, except for lethal control of depredating wolves, would still be prohibited under a threatened status. JSMF ¶ 303. Tolerance remains an important aspect of wolf recovery and the allowing of lethal control of depredating wolves will arguably improve human tolerance of the wolves' presence; the FWS believes that the primary determinant for wolf populations are human attitudes toward wolves. 68 Fed. Reg. at 15857; *also see*, JSMF ¶ 300. While predation is certainly not a new threat, the wolf populations have continued to expand in the face of human caused mortality. JSMF ¶ 293; 68 Fed. Reg. at 15851. Specifically, in "both the Eastern and Western DPSs the gray wolf population and the area occupied by gray wolves has continued to expand despite human-caused mortalities, including both illegal and legal killings. This indicates that total gray wolf mortality continues to be exceeded by wolf recruitment (reproduction and immigration) in these areas. " JSMF ¶ 293.

In making its determination to reclassify the gray wolf in the eastern and western DPS, the FWS considered the threats posed by existing regulatory mechanisms. JSMF ¶ 260. Because the FWS reclassified the gray wolf from endangered to threatened status, federal regulatory mechanisms still control. However, increasing interest by states and tribes to adopt management plans and conserve the gray wolf indicates a growing human

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT PAGE 18

tolerance to the presence of wolves.  Gray wolf recovery programs involve many partners in the private and public sector, at all levels of government and have resulted in increased conservation and protection and enhancement of gray wolf populations.  68 Fed. Reg. at 15821.  Concurrent with the reclassification, the FWS proposed modifications to the 4(d) rules to allow for control of depratory wolves that may help in preventing illegal takes.  JSMF ¶ 315.

The Plaintiffs can not successfully argue that the gray wolf is a species in danger of extinction throughout all or a significant portion of its range because it has met its respective recovery plan reclassification goals and because the listing factors for determining a species' status show that despite any current or foreseeable threats it is still moving toward recovery and its status is well improved from being endangered.  That the plaintiffs argue that the gray wolf is in danger of extinction is even more implausible given that the gray wolf has met its recovery goals in the western Great Lakes region and nealy met its recovery goals in the Northern Rockies.

Put in another light, if the gray wolf were proposed for listing as an endangered species at this time, it would not meet the listing criteria.  The FWS's application of the principles of conservation biology show that the gray wolf's representation, resiliency, and redundancy indicate it is not likely to become endangered in the foreseeable future.  The record shows that for the eastern and western DPS, habitat is stable, take from commercial, recreational and conservation purposes is not a threat, disease and predation are present factors and the wolf has continued to recover, and state and tribal regulatory mechanisms do not impact a threatened species, but indicate increasing sophistication in management plans for the protection for wolves.

INTERVENOR STATE OF MONTANA BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PAGE 19

In summary, the administrative record shows that the FWS considered the factors relevant to its DPS determination and its reclassification determination, because the administrative record shows that the FWS considered the factors set out in the ESA, its implementing regulations, and the DPS policy.  The administrative record also demonstrates that the FWS based its decision on the facts in the record and articulated a rational connection to the choices it made because it explains how it made its decisions and why it did not make the decisions the plaintiffs hoped it would.

Respectfully Submitted this 15th day of September, 2004.

/s/ Martha Williams
MARTHA WILLIAMS
Special Admissions
(406) 444-2551
Special Assistant Attorney General
State of Montana
Agency Legal Counsel
Montana Department of Fish, Wildlife and Parks